IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

TAKAEUS MAKEON GRAHAM,      )
      Plaintiff,         )        Civil Action No. 7:17-cv-00035
                   )
v.                  )
                   )
S. STALLARD, *et al.*,      )        By: Elizabeth K. Dillon
      Defendants.     )           United States District Judge

**MEMORANDUM OPINION**

This civil rights action pursuant to 42 U.S.C. § 1983 was filed by plaintiff Takaeus

Makeon Graham, a Virginia inmate proceeding *pro se*.[1]  Graham's amended complaint names

the following individuals, all of whom were Virginia Department of Corrections ("VDOC")

employees at the relevant time: S. Stallard, M. Broyles, E. Stout, B. Berg, C.W. Franks, S.

Collins, L. Fleming, J. Collins, J. Combs, A. Gilbert, B. Ravizee, C/O Carmony, C/O Caudill, Lt.

C. King, J. Fields, C/O Wells, Belcher, N. Gregg, H. Clarke, A.D. Robinson, and M. Elam.

Graham also has named as defendants VDOC, an agency of the Commonwealth of Virginia, and

Wallens Ridge State Prison ("Wallens Ridge), where he was incarcerated at all relevant times.

Pending before the court is defendants' renewed motion for summary judgment.  In it, all

defendants seek summary judgment against Graham's many claims on several different grounds.

Upon review of the record, the court concludes that the motion for summary judgment should be

granted, in large part, but denied as to three of Graham's claims.  Specifically, the court will

deny without prejudice summary judgment as to claims (d), (e), and (o).  In claim (d), Graham

alleges that he was denied access to toothpaste, shampoo, and deodorant for months in the spring

---

[1]  When he filed this lawsuit in January 2017, Graham was in Virginia Department of Corrections
("VDOC") custody.  He subsequently was released from custody and was on post-release supervision.  He was
returned to VDOC custody and transferred to a VDOC facility on August 2, 2019.  He is presently incarcerated at
Greensville Correctional Center.

of 2016 while at Wallens Ridge.  Claim (e) alleges that he was chronically underfed while at

Wallens Ridge, and claim (o) alleges that he was denied a vegan/vegetarian diet that he requested

pursuant to his religious beliefs.

Two motions by Graham are also pending.  The court will require the remaining

defendants to respond to Graham's motion for emergency injunctive relief and will deny his

motion for appointment of a master.

## I.   BACKGROUND

### A.  Graham's Claims

Graham's claims arise from events he alleges occurred while he was incarcerated at

Wallens Ridge.  Defendants construe Graham's complaint as asserting the following claims:

> a. Upon his arrival at Wallens Ridge, Graham was denied 18 meal trays and one
> of the trays he received was empty and thrown on the floor by an officer (Am.
> Compl ¶ 3, at 2, Dkt. No. 20);
>
> b. Staff placed rocks in his food "at least ten times" (*id.*);
>
> c. Officer Caudill threw a meal tray on Graham's cell floor and told him to pick it
> up or he would not eat again that day.  Graham refused to do so and, as a result,
> was unfairly charged with disobeying a direct order (*id.* ¶ 3, at 2–3);[2]
>
> d. Graham was indigent and was denied toothpaste, toothbrushes, combs, and
> shampoo from April through June of 2016, resulting in irritated teeth and a "black
> hole" in his back tooth (*id.* ¶ 3, at 3);
>
> e. Graham was severely underfed at Wallens Ridge and when he reported it to
> Stallard, Belcher, Broyles, and Stout, they did nothing to improve food portions
> (*id.*);
>
> f. Unit Manager Collins and Lieutenant King deprived Graham of outdoor
> recreation for 8 months while he was housed in the grooming Violator Housing
> Unit ("VHU") (*id.*);
>
> g. Graham was not provided with gloves to clean his toilet, sink, floor and toilet
> drains (*id.*);

---

[2]  In describing this event, Graham does not deny that he refused to pick up the tray when asked, but he
explains that he had already given the Caudill the tray once and it was "inhumane" of Caudill to throw it on the floor
and then direct Graham to pick it up.  (Pl.'s 1st Opp'n 23, Dkt. No. 42.)

h. Wallens Ridge kept the lights on for 24 hours each day (*id.*);

i. Officers Wells and Carmony denied him showers and outdoor recreation on unspecified dates (*id.*¶ 3, at 4);[3]

j. Caudill and King threw his clothes away and dragged his property across the floor when he went to segregation on an unspecified date (*id.*);

k. Unidentified officers threw away his legal mail and hygiene products on an unspecified date (*id.* ¶¶ 3, 6, at 4);

l. Defendants took away his good time without justification, and Graham's annual review conducted by Gilbert on an unspecified date was used as punishment. Gilbert required Graham to complete an outpatient program which was unattainable and penalized him during his annual reviews in 2016 and 2017 for non-completion (*id.* ¶ 3, at 4);

m. King placed Graham in segregation on June 22, 2016 because Graham filed grievances about Wells and Carmony and because Graham sent Robinson and Clarke a letter about unlawful behavior at Wallens Ridge (*id.* ¶ 4, at 4);

n. Graham served 14 days in segregation for a 241A charge (possession of alcohol), and he also was penalized with a fine for the same charge (*id.* ¶¶ 4, 7, 8, at 4);

o. Defendants denied Graham a vegan diet without eggs and dairy products, which he requested for his Rastafarian faith (*id.* ¶¶ 3, 4, 14, 15, at 5–6);

p. General population offenders housed in other units at Wallens Ridge have better job and educational opportunities than Graham and other offenders housed in the VHU (*id.* ¶ 12, at 8).

In his opposition, Graham disagrees with defendants' characterization of his claims, but only insofar as he contends that some of what they have described as separate claims are simply part of his claim that, cumulatively, living conditions in the VHU at Wallens Ridge violated his Eighth Amendment rights. But to the extent he failed to properly exhaust any of these issues, the court may not consider them on their merits, as discussed herein.

At least some of what Graham argues in his opposition concerns claims that are not fairly

---

[3] Graham's amended complaint did not identify specific dates for many of his allegations, but his opposition and summary judgment exhibits include some. For example, Graham alleges Carmony and Wells denied him pod recreation on May 14, 2016, June 15, 2016, and September 18, 2016, and other times. (Pl.'s 1st Opp'n 20, Dkt. No. 42.)

presented in his complaint.  For example, he references repeatedly that the grooming policy that required him to cut his hair violated his equal protection rights because it is not applied to female inmates.  His amended complaint does not mention different treatment of females anywhere as a ground for relief.  Instead, his amended complaint alleges only that he is being treated differently from general population inmates at Wallens Ridge and from other inmates with the same security level held at other VDOC prisons.  (Am. Compl. ¶ 13, at 8.)

Additionally, his opposition raises arguments concerning the validity of the grooming policy and whether it violated his religious rights, and he has submitted affidavits of other prisoners addressing this issue, as well.  (*See, e.g.*, Dkt. No. 42-3 at 77; *see also* Dkt. No. 42-4 at 5.)  But aside from a single line in his demand for relief, in which he asks to be "housed at any level one prison in any state that will allow the Plaintiff to keep his hair, and stay in general population" instead of segregation, (Am. Compl. 10), his amended complaint does not refer to being forced to choose between keeping his hair and staying in general population and nowhere does it assert that the grooming policy itself was a violation of his religious rights.  Moreover, Graham's request to be housed elsewhere seems to be his standard request for relief in response to many injustices he believes he has suffered.  Indeed, similar requests appear in many of Graham's grievance documents—asking to be transferred to a prison that does not require him to cut his hair in North Carolina, or to the custody of the federal Bureau of Prisons—even when the topics of those grievances are completely unrelated.  For these reasons, the court does not construe his amended complaint as fairly asserting a direct challenge to the grooming policy itself, whether on religious grounds or otherwise.

Defendants argue that they are entitled to summary judgment for several reasons.[4]  First,

---

[4]  In light of the court's rulings, it is not necessary to address all of defendants' arguments.

they argue that Graham failed to exhaust his administrative remedies as to seven claims: (a), (d), (g), (h), (j), (m), and (o).  They interpret claim (o) as asserting a claim under the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, *et seq.*, and interpret the remaining claims as being brought pursuant to the Fifth, Eighth, or Fourteenth Amendments.[5]  They further contend that they are entitled to summary judgment as to all of the exhausted claims, on various grounds.

The court turns first to the facts set forth by the parties in the summary judgment record. The record in the case includes ten affidavits submitted by defendants, eight of which were executed in 2017 and first submitted in conjunction with their first motion for summary judgment.  The other two were executed in January 2020.  In opposition, Graham has filed an opposition and affidavit (Dkt. No. 95), which also incorporates by reference his verified opposition to defendants' first motion for summary judgment, Dkt. No. 42, along with all its exhibits.[6]  The court also has considered Graham's verified amended complaint as evidence in opposition to the summary judgment motion.  *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (allowing statements in a verified complaint, if based on personal knowledge, to be treated as evidence in opposition to a summary judgment motion).

## B.  Factual Background

### 1.  Graham's history of incarceration

Graham was incarcerated at Wallens Ridge beginning on September 22, 2015.  He filed

---

[5]  Graham's first opposition refers repeatedly to the Fourth Amendment and to being "seized" when moved to a segregation unit.  Courts that have addressed similar Fourth Amendment claims analyze them using the "protected liberty interest" requirement applicable to due process claims.  *See Gentry v. Virginia Dep't of Corr.*, No. 1:17CV766 (LO/IDD), 2019 WL 2288438, at *6 (E.D. Va. May 28, 2019) (collecting authority).  Thus, Graham's Fourth Amendment claims fail for the same reasons his Fourteenth Amendment claims fail.  *See infra* Section II-D.

[6]  Graham's second opposition states that he is incorporating by reference his first opposition to the defendants' first summary judgment motion (Dkt. No. 95 at 2), which he says was filed on November 21, 2017.  There is no document filed on or around the date he provides, but his first opposition (Dkt. No. 42), filed on October 16, 2017, is the only document matching his description.

this action on January 27, 2017, while still housed at Wallens Ridge, but was released from Wallens Ridge and VDOC custody under post-release supervision on October 17, 2017.  While the case remained pending, either before this court or the Fourth Circuit,[7] Graham was subsequently returned to VDOC custody and housed at Nottoway Correctional Center starting on August 2, 2019.  He was transferred to Wallens Ridge on September 13, 2019, and placed in restrictive housing because he refused to take a test to screen for tuberculosis, which is required of all entering VDOC offenders.  On December 18, 2019, after complying with the test requirement, he was transferred to the Greensville Correctional Center and remains there, housed in general population, at least as of January 2020.  (Anderson Aff. ¶¶ 4, 7, 9–11, Dkt. No. 92-1.)

### 2.  Grievance procedure at the Virginia Department of Corrections

VDOC Operating Procedure ("OP") 866.1, titled "Offender Grievance Procedure," is the mechanism used to resolve inmate complaints, and it applies to most aspects of prison life. Disciplinary hearing decisions, state and federal court decisions, laws and regulations, Parole Board decisions, and matters beyond the control of VDOC, however, are not grievable.  OP 866.1 requires that, before submitting a formal grievance (also known as a "regular grievance"), the inmate must demonstrate that he has made a good faith effort to resolve the issue informally through the procedures available at the institution to secure institutional services or resolve complaints.  Generally, this may be accomplished by submitting an informal complaint to the grievance department, which is then forwarded to the appropriate staff for investigation and response.  The response should be given within 15 calendar days.  (Ravizee Aff. ¶¶ 4–6 & Encl. A, Dkt. No. 92-2.)

If the informal resolution effort fails, the inmate must initiate a regular grievance by

---

[7]  In March 2018, this court dismissed Graham's case based on his failure to maintain a valid address with the court.  Several months later, Graham moved to reopen his case, and he also filed a notice of appeal.  After the Fourth Circuit dismissed his appeal as untimely, this court granted his motion to reopen the case in October 2019.

filling out the appropriate form.  Regular grievances generally must be submitted within 30 days from the date of the incident or discovery of the incident.  Even if an offender has not received a response to an informal complaint, the offender still must submit the regular grievance within 30 days of the date of the incident or its discovery and can submit the informal complaint *receipt* as documentation, rather than the informal complaint itself, as is normally required.  (Ravizee Aff. ¶ 6; OP 866.1 § V(A)(3).)

Prior to reviewing the substantive claims of the grievance, prison officials conduct an "intake" review to ensure that it meets the published criteria for acceptance.  In addition to including the informal complaint or receipt, the grievance must raise a grievable issue and may contain only one issue.  (Ravizee Aff. ¶¶ 5, 7; OP 866.1 §§ IV(M), VI(A)(2)).  A grievance also may be rejected because it is filed beyond the deadline, is repetitive, or because is it a request for services.  If the grievance does not meet the criteria for acceptance, prison officials complete the "intake" section of the grievance and return it to the inmate with instructions on how to remedy any problems with it.  That should be done within two days of receipt.  The inmate may seek review of the intake decision by sending the grievance form to the regional ombudsman.  There is no further review of the intake decision.  (Ravizee Aff. ¶ 5.)

Notably, OP 866.1 explains that "[i]f a Regular Grievance does not meet the criteria for acceptance and review by the Regional Ombudsman does not result in intake into the grievance process, the issue must be resubmitted in accordance with the criteria for acceptance.  The exhaustion of remedies requirement will be met only when the Regular Grievance has been accepted into the grievance process and appealed through the highest eligible level without satisfactory resolution of the issue."  (Ravizee Encl. A, OP 866.1 § IV(O)(2)(b).)  Thus, if a prisoner never submits a regular grievance, or his regular grievance is never properly submitted and is instead rejected at intake, he has not properly exhausted.

There are three levels of review for an accepted regular grievance.  The Facility Unit Head of the facility in which the inmate is confined is responsible for Level I review, and a response must be issued within 30 days.  A dissatisfied inmate may appeal to Level II, where the appeal is reviewed by the Regional Administrator, the Health Services Director, or the Chief of Operations for Classification and Records.  Level II responses must be made within 20 days.  For most issues, Level II is the final level of review.  The Level II response informs the offender whether he may pursue an appeal to Level III, which is the final level of review.  For those issues appealable to Level III, the Chief of Corrections Operations or Director of VDOC conducts a review of the grievance, and the response must be made within 20 days.  (Ravizee Aff. ¶ 7.)

Rather than discussing the factual background concerning Graham's attempts at exhaustion here, the court will provide those facts in the context of analyzing defendants' arguments concerning exhaustion.  *See infra* at Section II-B.

### 3.   Facts related to Graham's food claims

According to affidavits from defendants Gregg and Broyles,[8] VDOC facilities follow the Master Menu and adhere to the portions as directed on the Master Menu.  Offenders in segregation receive the same number and type of meals as those meals served to the general population.  The planning and preparation of all meals takes into consideration food flavor, texture, temperature, appearance, and palatability.  Portion control is used in meal planning, preparation, and service in order to prevent excessive plate waste and leftovers.  Portions are served in those quantities indicated on the Master Menu, and specific utensils are used to maintain the proper portions.  Additionally, numerous quality control measure are in place.  For example, numerous spot checks are conducted daily by the Assistant Food Director, Food

---

[8]  N. Gregg is VDOC's Dietician; Broyles was Wallens Ridge's Assistant Food Director.

Service Managers check all trays for each meal, and outside inspections occur where meals are checked by the VDOC Regional Director of Food Services. (Gregg Aff. ¶¶ 5–6; Dkt. No. 92-6, Broyles Aff. ¶ 6, Dkt. No. 92-3.)

The Master Menu ensures that nutritionally adequate food is provided, and the daily calorie count for three meals from the Master Menu averages 2600 to 2700 calories. The VDOC menus are analyzed and certified to meet or exceed the Recommended Dietary Allowances as defined by the Food and Nutrition Board of the National Academy of Sciences. (Gregg Aff. ¶¶ 5–7.)

With regard to Graham's request for a vegan diet, VDOC does not provide a specific vegan diet. Instead, an alternative/vegetarian entrée for each meal is indicated on the Master Menu. At the relevant times, Graham was receiving a non-meat tray (or meat alternative tray). Non-meat trays are prepared from the Master Menu, but the meat entrée is replaced with another option, typically either cheese or peanut butter for breakfast and beans or peanut butter for dinner. Only the meat entrée is replaced and the original menu is otherwise followed. (Gregg Aff. ¶ 6; Broyles Aff. ¶ 5.)

Although Graham claims that he requested an egg free and dairy free diet, there is no offered substitute for eggs as eggs are not considered a meat. If an offender is allergic to eggs, then a substitute would be provided as it would be medically advised. If Graham chooses not to eat eggs when offered on the menu, it could compromise his protein intake as eggs are offered several times on the menu. However, the diet remains nutritionally adequate. (Gregg Aff. ¶ 5; *see also* Broyles Aff. ¶ 5.)

VDOC offenders also are provided the privilege of purchasing snacks and other food items from the institutional commissary, although an offender assigned to segregation may not have access to the commissary. Because Graham was housed in the VHU, which is a general

9

population assignment, he had access to the institutional commissary while in that unit.  (Gregg Aff. ¶ 7.)

For the brief periods of time that Graham was in segregation, he would not have been able to purchase commissary food.  Additionally, staff is required to document whether segregation offenders accept their meal trays, and Wallens Ridge records indicate that during the period of September 22, 2015 through October 13, 2015, Graham accepted all of his meal trays except for one tray on September 22, 2015 and one tray on September 23, 2015.  (Broyles Aff. ¶ 8 & Encl A.)

According to Broyles, staff does not place rocks in offender food.  Broyles admitted, however, that some foods such as dried beans and greens may contain small pebbles or sand due to the method of growing and harvesting.  And although all vegetables are culled, cleaned, washed before the cooking process begins, and cooked in accordance with the Food Service Manual, it is possible that a pebble that is the same color as the beans may pass through the process.  Broyles also testified that specific trays are not prepared for individual offenders, although trays for offenders on particular diets are color-coded.  (Broyles Aff. ¶ 4.)

Broyles summarizes by saying that he had no reason to believe that Graham received an inadequate number of calories during his incarceration in Wallens Ridge.  (Broyles Aff. ¶ 7.) Instead, Graham's meals were planned and prepared in accordance with VDOC policy.

Defendants also have provided an affidavit of a nurse at Wallens Ridge, which summarizes the weights from Graham's medical records as follows:

> A review of Graham's medical progress notes indicates that when he was received by the Virginia Department of Corrections from the local jail on March 3, 2015, he weighed 149 pounds. On April 14, 2015, upon arrival at the Keen Mountain Correctional Center, Graham weighed 151 pounds. On arrival at the Wallens Ridge State Prison on September 22, 2015, Graham refused to participate in the physician's history and physical examination. His weight

was documented as 151 pounds. His progress notes reflect that on September 1, 2016, he weighed 159 pounds (with restraints). His most recent weight was taken on April 24, 2017 and he weighed 163 pounds. Graham has gained weight during his VDOC confinement.  I have no reason to believe that Graham is not receiving an adequate diet.

(Stanford Aff. ¶ 4 & Encl. A, Dkt. No. 92-10.)

Graham generally disputes Gregg's and Broyles's assertions that the amount of food served at WRSP is nutritionally adequate, and he avers that the portions at WRSP are smaller than at other VDOC prisons.

He also disputes the allegations concerning his weight, claiming that defendants are concealing or misleading the court about the effects that the inadequate diet has had on Graham's weight and health.  He specifically avers that he lost 14 pounds while at Wallens Ridge.  When he was weighed at Wallens Ridge in September 2015, he says he weighed 157 pounds, although that is not the weight in his medical records.  By the time he went to segregation in June 2016 (approximately nine months later) after being underfed, he weighed only 143 pounds when weighed with restraints on.  (Dkt. No. 42-4 at 33 (Graham affidavit).)[9]  Without proof, Graham suggests that his medical records have been altered or concealed, and he avers that he has attempted to obtain other records of his weight from VDOC, but has been unable to do so. Graham also alleges that, during his second period in custody, he weighted 135 pounds when he left WRSP on December 18, 2019, and later, at Greensville, weighed 165 pounds because he was fed more food at Greenville.

Moreover, according to his affidavit, for the three-month period of April through July 2016, when he did not have extra money to buy food at the commissary, he was "passing out

---

[9]  He also points to Exhibit 75, which shows that, in December 2014, when he was booked into the Hampton Roads Regional Jail, his height was recorded as 5'7", and his weight was recorded at 153.  Other medical records have his height at 5'8" or 5'9".

from hunger, . . . breaking into severe sweats, and experiencing severe stomach aches every day for three months and a week." (Dkt. No. 42-4 at 34.) He claims that, in July 2016, he was able to begin buying food again at the commissary and was able to increase his caloric intake to gain weight, which is why his September 2016 weight was higher. Graham also submits an affidavit from a fellow inmate, Thompson, who claims that he is likewise not being given his requested religious diet and also that he is underfed almost every meal daily at WRSP and is "being denied adequate food." (Thompson Aff., Dkt. No. 42-4 at 5.)

Graham further notes that because defendants knew there occasionally were rocks in the beans, they had an obligation to substitute other foods or find a "higher quality FDA-approved bean seller." (Pl.'s 1st Opp'n 12.) He also presents numerous statements as facts, but they are really unsupported opinions by him about what is required by nutritional guidelines and what an ideal diet should look like, including his suggestions as to how VDOC should improve its quality and variety of fresh fruits and vegetables. (*See* Pl.'s 2nd Opp'n 4–5.) He also disputes Broyles's contention that he only refused two trays in the fall of 2015, pointing to a document Graham filed shortly after his arrival at Wallens Ridge. In it, Graham alleged that he missed five trays because he had not yet received his requested vegetarian diet and he initially refused to accept trays with meat on them.

### 4. Facts related to Graham's confinement in the Violator Housing Unit

Beginning on February 17, 2016, Graham was placed in the grooming VHU at Wallens Ridge because he refused to comply with grooming standards on that date as set forth in OP 864.1, *Offender Grooming and Hygiene* (effective date August 1, 2016). (Collins Aff. ¶ 4 & Encl. A, Dkt. No. 92-4.)[10] Graham explains that his Rastafarian faith precludes him from cutting

---

[10]   The current grooming policy has an effective date of June 1, 2019. (*See* Anderson Aff. ¶ 10 & Encl. D, OP § 864.1). The new policy allows hair of any length, with certain exceptions (such as if the inmate is convicted of concealing contraband in his hair or altering his hair in an attempt to disguise his identity). *See* OP § 864.1.

his hair; thus, he refused to comply with the grooming policy, which required a shorter hair. Graham remained in the VHU until his release from VDOC custody on October 13, 2017, a period of approximately twenty months. The VHU was a separate unit in that the offenders were housed separately and not provided access to other general population offenders for any reason, including programs and religious services. This was done in order to prevent VHU offenders from passing contraband (which, according to the grooming policy, could be hidden in their hair), to other general population offenders. But the offenders in the unit were considered to be in general population status. (Collins Aff. ¶¶ 4–5.)

Offenders in the VHU, like Graham, had access to offenders in their own unit and they had other privileges that inmates in other types of segregation units were not given. For example, Graham had access to the institutional commissary and was permitted to spend up to $10 per week. He also had access to long-distance learning and some other programs in which he participated, including resources for successful living and PREPS, a re-entry program. The VHU offenders also were to receive the same recreation as the regular general population with one hour of outside recreation daily and two hours daily of inside pod recreation. During in-pod recreation time, offenders could also shower, use the telephone, and access the J-Pay kiosk. During outside recreation, offenders could exercise on the yard and play ball. (Collins Aff. ¶¶ 5–7.)

In order to participate in recreation, offenders were required to follow the rules in the housing unit. If an offender did not follow the rules, security staff could send the offender back to his cell for that hour. When the offender's behavior improved, he would be allowed to return to pod recreation. While Graham alleges that Officers Carmony and Wells prevented him from showering and recreating, neither Graham nor the officers ever expressed any complaints regarding this issue to Collins, who was the VHU Unit Manager at that time. Also, Wells and

Carmony worked in the VHU, but they did not work there for the several months preceding September of 2017.  (Collins Aff. ¶ 6.)  Each offender in the VHU also had access to soap, water, a washcloth, and towels in his cell to clean himself.

Graham asserts two different claims based on his housing in the VHU unit.[11]  First, Graham contends that the conditions of confinement in the VHU violated his Eighth Amendment rights.  He notes, in particular, the alleged lack of nutrition, the inadequacy or denials of showers and recreation, and the denial of some privileges, including educational programming and employment opportunities.[12]

With regard to the opportunities to shower, Graham does not provide significant detail as to how often he was permitted to shower, or denied showering.  In his opposition, though, he focuses on the limited numbers of phones and showers available, concluding that even when he gets pod recreation, "half the time he still will not be able to take showers, use the telephone, or use the kiosk, and certainly will not be able to do all three."  (Pl.'s 1st Opp'n 22.)  He explains that twenty-two VHU inmates had to share two showers for the two-hour block of pod recreation and that often inmates would take twenty minutes to shower.  Assuming that is true, that would still allow twelve inmates—more than half of them—to shower daily: two inmates at a time over six 20-minute periods in the two-hour block.  Even if there were days he could not shower (or he chose to spend his time on the telephone or doing other activities), he could still have showered about every other day.  He also does not dispute that he had access to water, soap, and towels in his cell, but claimed that it was not possible to clean properly in the cell without getting in trouble for being naked.

---

[11]  As noted *supra*, Graham's opposition argues about the unconstitutionality of the earlier grooming policy itself, but that claim is not part of this case because it was not raised in his amended complaint.

[12]  He also includes as part of his omnibus conditions-of-confinement claim allegations that he did not exhaust, such as there being lights on all the time and being denied gloves for cleaning.

With regard to Graham's claim that he was "regularly" denied adequate recreation, the court first notes that his sworn testimony is entirely inconsistent about how much recreation he was given during his time in the VHU.  In his affidavit, he states that in phase I of the VHU, offenders got three hours out of their cells most days, and that phase II offenders were supposed to get six hours out of the cell, but they typically got only 5 hours out of the cell a lot of days. (Graham Aff., Dkt. No. 42-4.)  He also states that he was deprived of pod and outside recreation on certain occasions (referring to grievances on the topic), but then says it happens "all the time." His complaint alleges that he was denied recreation for eight months, without explaining whether that meant he received no recreation at all for eight months, or that he was occasionally denied recreation over a period of eight months.  (Pl.'s 1st Opp'n 20–24.)  He also complains about the lack of certain gym equipment and a general inability to engage in what he deems to be sufficient cardiovascular activity.  Overall, the impression left by his testimony (to the extent it is at all consistent) is that he was not always permitted to engage in recreation on a daily basis.  Instead, there were times (although certainly not daily) when he was denied recreation by officers and other times when he found the time or equipment allotted for recreation insufficient.

Graham's second claim arising from the VHU is that his placement there constituted an equal protection violation because he was treated less favorably than other general population inmates and than offenders with the same security level.

### 5.  Other relevant facts

Defendants also include separate sections concerning facts related to other claims, including claims arising from his disciplinary convictions, institutional classification, and alleged confiscation or destruction of his property.  The court's rulings on those claims, however, are not heavily fact-dependent.  Thus, the court will discuss limited facts as necessary and in context in addressing the merits of those claims.

15

## II.   DISCUSSION

### A.   Summary Judgment Standard

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[13] A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party.  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).  In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48.  Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990).

### B.   Some of Graham's Claims are Barred Because He Failed to Exhaust Them

#### 1.   Exhaustion under the PLRA

As noted, defendants ask for summary judgment on seven claims on the grounds that Graham failed to exhaust his administrative remedies.  The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such

---

[13] Internal citations, alterations, and quotation marks are omitted throughout this opinion, unless otherwise noted.  *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  The exhaustion requirement "allow[s] a prison to address complaints about the program it administers before being subjected to suit, reduc[es] litigation to the extent complaints are satisfactorily resolved, and improve[es] litigation that does occur by leading to the preparation of a useful record." *Jones v. Bock*, 549 U.S. 199, 219 (2007).  "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court."  *Id.* at 211.

The PLRA requires "proper exhaustion" of available remedies prior to filing suit. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006).  "[P]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceeding." *Id.* at 90–91.  Thus, an inmate's failure to follow the required procedures of the prison's administrative remedy process, including time limits, or to exhaust all levels of administrative review is not "proper exhaustion" and will bar the claim.  *Id.* at 90.  Even if the relief sought is not available in the grievance process, such as monetary damages, an inmate still must exhaust. *Porter v. Nussle*, 534 U.S. 516, 524 (2002).  Notably, moreover, district courts may not "excuse a failure to exhaust."  *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016).

A prison official has the burden to prove an inmate's failure to exhaust available administrative remedies.  *Jones*, 549 U.S. at 216.  Once a defendant presents evidence of a failure to exhaust, the burden of proof shifts to the inmate to show, by a preponderance of the evidence, that exhaustion occurred or administrative remedies were unavailable through no fault of the inmate.  *See, e.g.*, *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011); *Graham v. Gentry*, 413 F. App'x 660, 663 (4th Cir. 2011) (unpublished).

 "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it."  *Moore v. Bennette*, 517

F.3d 717, 725 (4th Cir. 2008).  "[W]hen prison officials prevent inmates from using the administrative process . . . the process that exists on paper becomes unavailable in reality."  *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).  The Supreme Court has explained that an administrative remedy is considered unavailable when: (1) "it operates as a simple dead end— with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Ross*, 136 S. Ct. at 1859–60.  Federal courts are "obligated to ensure that any defects in exhaustion were not procured from the action or inaction of prison officials."  *Hill v. O'Brien*, 387 F. App'x 396, 400 (4th Cir. 2010).

### 2.  Graham's attempts at exhaustion

Through Ravizee's affidavit, defendants have presented evidence that Graham failed to fully exhaust claims (a), (d), (g), (h), (j), (m), and (o).  (Ravizee Aff. ¶¶ 9, 12, 15, 16, 18, 21, 23.) Graham disagrees and contends that he has exhausted all available remedies as to all claims. Also relevant to this issue are a number of Graham's exhibits, all attached to his first opposition (Dkt. No. 42-1 to 42-4).

As to claims (a) and (g), Ravizee states that Graham did not submit any regular grievances regarding these claims.  In response, Graham asserts that he was unable to exhaust these claims because unidentified correctional officers threw away his informal complaints and grievances. [14]  (Pl.'s 1st Opp'n 2.)  Graham's contention that he exhausted available remedies,

---

[14]  As to claim (g), Graham also alleges that he was permitted to exhaust this issue *after* the lawsuit was filed.  (Pl.'s 1st Opp'n 6.)  But "'the language of section 1997e(a) clearly contemplates exhaustion prior to the commencement of the action as an indispensable requirement, thus requiring an outright dismissal [of unexhausted claims] rather than issuing continuances so that exhaustion may occur.'"  *Carpenter v. Hercules*, No. 3:10-cv-241, 2012 WL 1895996, at *4 (E.D. Va. May 23, 2012) (quoting *Johnson v. Jones*, 340 F.3d 624, 628 (8th Cir. 2003)); *see Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 675 (4th Cir. 2005) (stating that the PLRA requires exhaustion "before filing an action").

however, is unsupported by competent evidence.  Notably, he does not say who threw away his informal complaints or grievances, when they did so, or offer any detail as to these assertions.  Numerous courts within the Fourth Circuit and elsewhere have held that "unsubstantiated and conclusory assertions by prisoner-plaintiffs that prison grievances were hindered, without providing any details regarding the date the alleged grievances were submitted or to whom they were submitted, fail to create a genuine issue of material fact sufficient to withstand summary judgment."  *Pickens v. Lewis*, No. 1:15-CV-275-FDW, 2017 WL 3277121, at *4 (W.D.N.C. Aug. 1, 2017).  Because all Graham has presented is similar unsubstantiated and conclusory assertions, Graham has failed to create a genuine issue of material fact as to claims (a) and (g).[15]

As to claim (d), Ravizee acknowledges that Graham filed grievances in July and August 2016 about not receiving indigent hygiene packages as necessary.  She explains, though, that the grievances were rejected on intake as they were a request for services and did not meet the definition of a grievance.  Graham disputes this contention and explains how he exhausted available remedies.  First, he provides paperwork showing that he filed an informal complaint and, after not receiving a timely response, filed a regular grievance, which was rejected as a request for services (even though he attached the informal complaint showing he had already requested services).  He then received a response to the informal complaint and then filed another grievance.  In it, he acknowledged that he had received some items from the indigent hygiene packages, but still wanted more and was missing some items from the package (combs and "free letters").  He also complained again about the fact that, although he had now received toothpaste, he had already gone for months without some hygiene items, like toothpaste.  (Dkt. No. 42-1 at 56–65.)  This grievance, too, was rejected as a request for services.

---

[15]   It is also worth noting that Graham was able to fully exhaust numerous of his other claims.  That fact undercuts any suggestion that prison officials were systematically interfering with his ability to exhaust his administrative remedies so as to render the system unavailable.

As to the lack of toothpaste, shampoo, and deodorant, however, he already had asked for those things and received them, but then filed his second grievance complaining that he had gone without them for so long and requesting money damages.  Despite that second grievance indicating that he had requested services already regarding those items, it, too, was rejected as a request for services.  At least as to the lack of those hygiene items, though, there was nothing additional Graham could request; he had already done so.[16]  Thus, his second grievance was improperly denied as a request for services as to those items.  Moreover, Graham appealed that intake decision, and the decision was upheld.  Thus, the court concludes that he exhausted *available* remedies as to claim (d), because his second grievance clearly showed that he had already requested services prior to filing his grievance, but was still dissatisfied with the past denial of the items.  He then appealed the improper intake decision, which was all he could do.

As to claim (h), Graham asserts that, like claims (a) and (g), he was unable to exhaust this claim because unidentified "officers threw away the informal complaints and grievances."  (Pl.'s 1st Opp'n 2.)  He also contends, though, that this issue—the lights being kept on is not grievable because it is "a policy," and he points to paragraph 5 of Ravizee's affidavit for support.  It does not appear from OP 866.1 that this issue would have been rejected as non-grievable, and certainly Ravizee does not state as much.  Graham's own interpretation and opinion of OP 866.1 on this point does not carry sufficient weight to defeat summary judgment or excuse his failure to even try to exhaust.  Likewise, as with claims (a) and (g), his conclusory allegations about his grievances being thrown away by officers, without detail as to names or dates, do not suffice to meet his burden to show remedies were not available to him.  Accordingly, the court concludes that he failed to exhaust claim (h).

---

[16]  He could have gone back and requested the combs and free letters from the appropriate person, and he does not show that he did so and *then* resubmitted the grievance.  So, as to the combs and free letters, he did not exhaust.

As to claim (j), concerning the handling of his property by Caudill, Ravizee notes that Graham filed a grievance regarding this issue, but it was rejected at intake because it was a request for services.  Instead, he was instructed to contact the unit manager of his pod about his clothing and property.  Graham confirms this, but he states that he did as he was directed and spoke with the unit manager, and complains that it did not remedy the issue.  He does not assert than he then re-grieved the issue, though, which is what he needed to do to properly exhaust.  That is, if he requested services and was still dissatisfied with the response, resubmitting the grievance was his remedy.  Because he failed to do so, he did not properly exhaust this claim and it is barred from consideration.[17]

As to claim (m), Ravizee contends that Graham submitted a regular grievance on July 18, 2018, questioning why he was sent to segregation and then returned to another housing unit.  That grievance was rejected for "insufficient information."  Graham appealed the intake decision, where it was upheld by the Regional Ombudsman on July 27, 2016.  He did not resubmit the grievance with any additional clarifying his complaint.

Graham responds by saying that he did exhaust this claim, relying on Exhibits 32, 33, and 34.  The court has carefully considered all of those exhibits but concludes that nothing about them supports an assertion that the grievance system was unavailable to Graham.  In particular, he only appealed the intake decision of his July 18, 2016 grievance.  From a review of that grievance and the attached informal complaint (Dkt. No. 42-2 at 6–7), it is unclear exactly what Graham is grieving.  He references his June 22, 2016 transfer to segregation (which he had referenced in a grievance filed the day before and rejected because it raised more than one issue).  The grievance states that the transfer was retaliatory action by King and emphasizes that Officers

---

[17]  Graham also asserts that he exhausted because someone told him that the issue was not grievable, pointing to Exhibit 32 for support.  Exhibit 32 does not relate to this claim and it is unclear how it supports his argument.  (Dkt. No. 42-2 at 1–3.)

Carmony and Wells were still in the pod when Graham returned from segregation.  It repeats

Graham's assertion that if King were trying to prevent an altercation between him and the two

officers, King should have removed those officers from the unit before bringing Graham back.

For relief, he asked to be transferred to a North Carolina prison; for King, Wells, and Carmony to

be moved to a different building; and for an answer to certain questions, including why he was

sent to segregation and why he was brought back with the same officers with whom King

believed he would have an altercation.  (*Id.* at 7.)

In rejecting this grievance at intake, Ravizee checked the generic explanation as

"insufficient information," but she wrote, "Can't grieve issue prior to occur[ring]."  She also

attempted to answer one of his questions by stating, "You were placed in seg due to you wrote

letter feared for your life . . . . [sic]."[18]  (Dkt. No. 42-2 at 8.)

The court cannot conclude that Ravizee's response rendered the grievance procedure

unavailable to Graham.  She apparently interpreted Graham's request as complaining about some

*anticipated* altercation or improper action by Wells and Carmony, which is a fair interpretation

overall, and she explained that he could not grieve an issue before it occurred.  To be sure,

Graham also referenced that he thought the transfer to segregation was retaliatory, but she

attempted to answer his question about that, as well.  Importantly, Graham had the option of

resubmitting the grievance with additional or clarifying information, but he never did so.

Accordingly, the court concludes that he failed to exhaust available remedies as to claim (m).

As to claim (o), Ravizee notes that Graham filed a grievance about spoiled milk products

and bitter tasting or rotten cheese being served at meals, but neither the grievance nor the

informal complaint mentioned an egg-free or vegan diet, nor does either document reference any

---

[18]   Additional words follow the quoted material, but it is unclear what they are.

need for a religious diet.  (*See, e.g.*, Ravizee Aff. ¶ 23 & Encl. J.)  Thus, Ravizee contends that

Graham did not exhaust the issues raised in claim (o).

In response, Graham points to Exhibits 7–9 of his opposition as proof that he exhausted

remedies.  Exhibit 7 is an informal complaint, dated August 29, 2016, that raises the issues in

claim (o), with Graham requesting both a vegan diet and referencing RLUIPA.  Broyles

responded on September 2, 2016, saying that food service does not support a vegan/vegetarian

diet, but that a meat alternative is offered for all three meals.  (Dkt. No. 42-1 at 18.)  Graham

then filed a regular grievance on September 7, 2016, which was rejected at intake as a request for

services.  He appealed that decision, and the intake decision was upheld.  (*Id.* at 19–20.)  (Dkt.

No. 42-1 at 20.)

Defendants have not responded to Graham's opposition.  Thus, they have not provided

any explanation as to why Ravizee did not reference these particular grievances in her affidavit,

in which Graham clearly raised the issue concerning his request for a vegan diet for religious

reasons.  Based on the current record, then, the court will deny defendants' motion for summary

judgment as to claim (o) on the exhaustion grounds.  As with claim (d), Graham's grievance was

rejected as a request for services, even though his informal complaint showed that he already had

requested services and his request had been denied.  Moreover, he was told in response to both

his informal complaint and in his grievance that VDOC does not offer a vegan diet.  It is not

clear what else he was expected to do to exhaust, where it was obvious that he already had

requested services and they had been denied.  Instead, he did what he could, which was to appeal

the intake decision as improper.  Based on the evidence presented, there is at least a dispute of

fact as to whether Graham exhausted his available remedies as to this claim.

### 3.  Summary of exhaustion rulings

To summarize the court's rulings on exhaustion, the court concludes that Graham failed

to properly exhaust the following claims and thus they are procedurally barred and cannot be considered by the court: claims (a), (g), (h), (j), and (m).  Thus, defendants are entitled to summary judgment based on a failure to exhaust as to those claims.

As to claims (d) and (o), the court concludes that there are disputes of fact as to whether Graham exhausted his available remedies.  Thus, the court will deny summary judgment without prejudice as to those two claims, and those claims will remain in the case at this time.

As to claim (d), the court will allow this claim to go forward at this time only as to defendant Fields, who is the only defendant identified by Graham in his opposition as playing a role in denying him his indigent packages.  As to claim (o), the text of Graham's complaint simply refers repeatedly to "defendants" denying him a vegan and religious diet, without identifying any specific defendants who made the decision to deny him such a diet.  Based on Graham's opposition and exhibits thereto, (*e.g.*, Pl.'s 1st Opp'n 6), the court will allow this claim to go forward as to defendants Gregg, Belcher, Stout, Broyles, and Stallard.  The court also will allow Clarke to remain as a defendant in his official capacity in the event that injunctive relief is ordered, as it is clear that he would have the authority to direct allowing a vegan diet for Graham.[19]  If Gregg or one of the other remaining defendants also has such authority, defendants should so advise the court and Clarke may be dismissed.

If they wish, defendants may file a renewed motion for summary judgment within thirty days, addressing those claims on their merits, as well as claim (e), *see infra* Section II(C)(1),

---

[19]  RLUIPA does not allow money damages, and it is questionable whether injunctive relief is available since Graham complains about food issues only at Wallens Ridge in his amended complaint.  In more recently filed documents, however, he continues to complain that he is being significantly underfed at a different facility and that his religious rights continue to be violated as a result of not being given a vegan diet.  (*See* Dkt. No. 97.)

which is permitted against the same defendants as claim (o).[20]  Otherwise, those three claims will be set for trial as against the listed defendants.[21]

## C.  Graham's Conditions-of-Confinement Claims

Prison officials must take reasonable measures to ensure the safety of inmates.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To make out an Eighth Amendment cruel and unusual punishment claim, a plaintiff must satisfy two prongs: first, "the deprivation of [a] basic human need was objectively sufficiently serious" and, second, "subjectively the officials acted with a sufficiently culpable state of mind." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (citing *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993)).

In the context of conditions-of-confinement claims, to determine if a deprivation is sufficiently serious as to satisfy the first prong, a court must evaluate the conditions in light of contemporary standards of decency, keeping in mind that the Eighth Amendment "does not mandate comfortable prisons" but only prohibits "extreme deprivations." *Shakka*, 71 F.3d at 166.  To demonstrate that the conditions are "extreme enough to satisfy the objective component of an Eighth Amendment claim, a prisoner must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions," or "demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions." *Id.*

Construing the evidence in the light most favorable to Graham, there is not sufficient

---

[20]  Defendants asked for the opportunity to file a new summary judgment on the merits if their arguments on exhaustion were rejected.  Graham objects to this request in his opposition, but the court finds this procedure proper and an efficient use of the court's and the parties' resources.  Exhaustion is a threshold issue that is often addressed separately from, and before, the merits of a prisoner's claims.

[21]  Defendants' motion also seeks qualified immunity as to all claims they contend were exhausted, including claim (e).  Their motion is being denied without prejudice, so defendants may again assert qualified immunity as to the remaining claims, including claim (e), in any summary judgment motion they file.

evidence from which a reasonable jury could return a verdict in his favor on the first prong as to

any of the conditions addressed below. *See Abcor*, 916 F.2d at 930. The court will not rule on

this time on claim (e), though, because it is so closely intertwined with claim (o), which

defendants have not yet briefed on its merits.

### 1. Complaints about food (claims (b) and (e))

As to claim (b), Graham has presented no evidence that staff *purposefully* placed rocks in

meals. Construing all facts in his favor though, at least ten times there was a pebble in his food

trays. This does not state an Eighth Amendment claim.

"It is well-established that inmates must be provided nutritionally adequate food, prepared

and served under conditions which do not present an immediate danger to the health and well-being

of the inmates who consume it." *Shrader v. White*, 761 F.2d 975, 986 (4th Cir.1985). Prison

officials satisfy their obligation by providing some food that the prisoner is able to eat without

compromising his health. *Scinto v. Stansberry* , 841 F.3d 219, 233 (4th Cir. 2016). A prisoner is

entitled, therefore, only to reasonably adequate food. *Hamm v. DeKalb County,* 774 F.2d 1567, 1575

(11th Cir.1985). "The fact that the food occasionally contains foreign objects or sometimes is served

cold, while unpleasant, does not amount to a constitutional deprivation." *Id.; Bedell v. Angelone,* No.

2:01CV780, 2003 WL 24054709, at \*14 (E.D. Va. Oct. 3, 2003) (explaining that short-lived

problems with food service and isolated instances of food containing foreign objects do not state

cognizable claims under the Eighth Amendment). The instances Graham describes of pebbles in his

beans fall squarely within the description of food occasionally containing foreign objects, and they

do not state a cognizable constitutional claim.

With regard to the food portions and the fact that he was not sufficiently fed (claim (e)),

the court will deny summary judgment as to this claim without prejudice. This claim is closely

interrelated with claim (o), his request for a vegan diet to accommodate his Rastafarian faith,

which has not yet been briefed on the merits.[22]  Instead of addressing them separately, then, the

court will consider these two claims together.  Accordingly, defendants' motion for summary

judgment will be granted as to claim (b) and denied without prejudice as to claim (e), which the

court construes as an Eighth Amendment conditions-of-confinement claim alleging a lack of

adequate nutrition.

### 2. Eighth Amendment claims about lack of recreation, showers, and other privileges in VHU (claims (f), (i), and (p))

None of the other conditions Graham identifies as unconstitutional are sufficiently

serious to state an Eighth Amendment claim, either.  With regard to being regularly denied

showers, the only specifics relayed by Graham (and construing them in a light favorable to him)

suggest that he was able to shower about every other day.  That alone does not constitute an

Eighth Amendment violation, and many courts have so held.  *E.g., Davenport v. DeRobertis*, 844

F.2d 1310, 1316–17 (7th Cir. 1988) (holding that allowing inmates in a segregation unit only one

shower per week was "constitutionally sufficient" and did not constitute an Eighth Amendment

violation); *Blackburn v. South Carolina*, No. 0:06-2011-PMD-BM, 2009 WL 632542, at *17

(D.S.C. Mar. 10, 2009) (concluding that ten days without a shower when first placed in a

segregation unit, followed by an average of one shower per week thereafter, was not a

constitutional deprivation); *Johnson v. Fields*, No. 2:14-cv-38-FDW, 2017 WL 5505991, at *10

---

[22]  The court recognizes that other district courts within the Fourth Circuit have held that a prison does not substantially burden an inmate's religious exercise by serving food items prohibited by his religion, so long as the diet is otherwise nutritionally adequate.  Those cases were decided on a fully-developed record, either at the summary judgment stage or after a trial.  *E.g.*, *Washington v. McAuliffe*, No. 7:16-CV00-00476, 2019 WL 1371859, at *5–*6 (W.D. Va. Mar. 26, 2019) (granting defendants summary judgment as to RLUIPA and First Amendment claims after concluding that VDOC's vegetarian diet did not substantially burden the Rastafarian plaintiff's religious beliefs because he could obtain sufficient calories from the vegetarian meal from the Master Menu and also could supplement his diet with additional food purchased at the commissary); *Miles v. Guice*, 688 F. App'x 177, 179 (4th Cir. 2017) (affirming summary judgment in favor of defendants and stating that the North Carolina prisoner's lack of access to a vegan diet was not a substantial burden on his religion).  Particularly given Graham's allegations about his weight loss (although contradicted by his medical records), it is preferable to resolve both of these claims together and on a fully-developed record.

(W.D.N.C. Nov. 16, 2017) ("Plaintiff's claim that he was denied a shower and clean clothes for twelve days is insufficient as a matter of law to maintain an Eighth Amendment claim."). Consistent with the foregoing cases, the court concludes that Graham has failed to state a claim under the Eighth Amendment as to the lack of showers.

Likewise, considering Graham's testimony about recreation as discussed above, the court concludes that his conclusory (and often inconsistent) assertions to not overcome the competent evidence put forth by defendants concerning the amount of recreation time he was given.  At worst, it appears that he was occasionally given less than his three hours of daily recreation, and sometimes none at all.  He also did not believe the exercise equipment provided was satisfactory.

Taking these allegations as true, he has not stated a viable Eighth Amendment claim. Indeed, courts have held that much more severe limitations on recreation and exercise than Graham describes do not violate the Eighth Amendment.  *E.g.*, *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992) (45 minutes of outdoor exercise per week with no injury suffered); *Bailey v. Shillinger*, 828 F.2d 651, 653 (10th Cir. 1987) (exercise of one hour per week outdoors).  Moreover, he has not asserted that he sought medical treatment or mental health treatment for any of the conditions allegedly caused by inadequate recreation.  *See Muwwakkil v. Johnson*, No. 7:09CV00318, 2010 WL 3585983 (W.D. Va. Sept. 13, 2010) (concluding that one hour a day of out-of-cell exercise did not violate the Eighth Amendment, even though it was only offered outside every other day, and where he never sought treatment for any resulting injury).

Cases where there has been a question of fact about an Eighth Amendment violations based on lack of showers and recreation have involved much more significant deprivations.  *See, e.g.*, *Rivera v. Mathena*, 795 F. App'x 169 (4th Cir. Nov. 19, 2019) (reversing the district court's grant of defendants' summary judgment motion on an Eighth Amendment claim, where plaintiff who was in segregation alleged that he twice went about eight weeks without a shower and

approximately two months without recreation, and that he typically received zero, one, or two opportunities each week to exercise).  As already noted, Graham's motion lacks the type of detail that was present in *Rivera.*  But he has presented no competent evidence to suggest that he was not permitted to shower for months on end or not allowed the opportunity to exercise for such lengthy amounts of time.  The occasional deprivations he references simply do not rise to the level of an Eighth Amendment violation.

Lastly, Graham's assertions about the lack of benefits given to VHU are likewise insufficient to allow a jury to conclude that there was an Eighth Amendment violation.  Nothing about not being permitted to take certain classes, participate in certain programs, or participate in prison employment caused Graham serious physical or emotional injury or a substantial risk of such harm.  *See Rhodes v. Chapman* , 452 U.S. 337, 348 (1981) (holding there is no Eighth Amendment right to classes); *Quarles v. Dillman*, 2011 WL 1869961, at *2 (W.D. Va. May 16, 2011) ("[I]nmates have no constitutional right to job or educational opportunities while incarcerated."); *Gholson v. Murry* , 953 F. Supp. 709, 719 (E.D. Va. 1997) (denying Eighth Amendment claim based on inability to participate in prison employment or other educational opportunities and noting that these are "clearly not a 'sufficiently serious' deprivation of 'the minimal civilized measure of life's necessities'" (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  Summary judgment will be granted as to claims (f), (i), and to any alleged Eighth Amendment violation that is part of (p)

### 3.   Cumulative conditions claims

In his opposition, Graham urges the court to consider together all of the conditions he had to endure while in the VHU and at Wallens Ridge, even though they are of different varieties, *e.g.*, due process violations, complaints about food, complaints about lack of recreation and showering, etc.  The Fourth Circuit has recognized that "[t]he failure of any single condition of

confinement to violate a prisoner's constitutional rights is not fatal to a claim under 42 U.S.C.

§ 1983; the cumulative effect of all conditions may render the confinement unconstitutional."

*Williams v. Griffin*, 952 F.2d 820, 824–25 (4th Cir.1991).  But the Supreme Court has clarified

that consideration of the cumulative effect of more than one condition is permitted only when the

conditions "have a mutually enforcing effect that produces the deprivation of a single,

identifiable human need such as food, warmth, or exercise—for example, a low cell temperature

at night combined with a failure to issue blankets."  *Id.* at 824 (quoting *Wilson*, 501 U.S. at 304).

Indeed, the *Wilson* Court rejected the idea that "all prison conditions are a seamless web for

Eighth Amendment purposes."  *Wilson*, 501 U.S. at 305.  Instead, conditions must combine to

cause a serious deprivation of a single human need.  *Id.*  In *Williams,* for example, the Fourth

Circuit found a cognizable "conditions of confinement" claim when serious prison overcrowding

was combined with highly unsanitary conditions.  *Id.* at 825.

The conditions of which Graham complains do not have the requisite "mutually enforcing

effect."  *Cf. Wilson*, 501 U.S. at 304.  Instead, his claims run the gamut—they challenge

disciplinary hearings against him, his security classification, the nutritional adequacy and safety

of the food served at Wallens Ridge, and the limited opportunities provided to VHU inmates to

exercise, shower, and access other programs and benefits.  *See Francis v. Woody*, No.

3:09CV235, 2011 WL 2693206, at *11 (E.D. Va. July 11, 2011), *aff'd,* 450 F. App'x 303 (4th

Cir. 2011) (where plaintiff's challenges did not show multiple conditions of confinement

working to deprive him of a single human need, the court would not consider them

cumulatively).  Thus, considering the claims cumulatively, they still are insufficient to establish

an Eighth Amendment violation.

### D.  Due Process Claims (Claims (c) and (n))

To the extent Graham is claiming that his placement in segregation (or in the VHU)

30

violated his constitutional *due process* rights, those claims fail.  Confinement in segregation by itself does not trigger due process protections.  Instead, mere limitations on privileges, property, and activities for administratively segregated inmates "fall[ ] within the expected perimeters of the sentence imposed by a court of law."  *Sandin v. v. Conner*, 515 U.S. 472, 485 (1995); *Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991) (holding that "changes in a prisoners' [sic] location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges—matters which every prisoner can anticipate are contemplated by his original sentence to prison—are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage the prisons safely and efficiently").

It is well established that a temporary assignment to segregated confinement—even six months or more, with reduced privileges, few out-of-cell activities or socialization opportunities, and heightened security measures—is *not* an atypical or significant hardship.  *See Sandin*, 515 U.S. at 485–86 (finding that 30 days in such conditions did not trigger protected liberty interest); *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (finding six months under conditions dictated by administrative segregation policies was not atypical under *Sandin*).  Thus, the court concludes that neither Graham's short stints in segregation nor his long-term placement in the VHU unit in general population status triggered any constitutionally protected liberty interest.

### E.   Equal Protection Claim (Claim (p))

In claim (p), Graham contends that offenders like him who were housed in the VHU were treated differently than general population offenders housed in other units at Wallens Ridge and that this difference in treatment violated his constitutional right to equal protection.  In particular, he alleges that general population offenders have better job and educational opportunities than

VHU inmates.  He also references being treated unfavorably relative to other non-VHU offenders with the same security level.

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The Equal Protection Clause thus directs that "all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

To prove an equal protection violation, a litigant "must first demonstrate that he has been treated differently from others with whom he is similarly situated."  *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)).  Two groups of persons are "similarly situated" only if they "are similar in all aspects relevant to attaining the legitimate objectives" of the policy or legislation.  *Van Der Linde Housing, Inc. v. Rivanna Solid Waste Auth.*, 507 F.3d 290, 293 (4th Cir. 2007).  Once such a showing is made, then the court will determine "whether the disparity in treatment can be justified under the requisite level of scrutiny."  *Veney*, 293 F.3d at 731 (quoting *Morrison*, 239 F.3d at 654).

Graham cannot establish an equal protection violation, most notably because the offenders in the VHU are not similarly situated to regular general population inmates or to non-VHU offenders with the same security levels.  Inmates were held in the VHU specifically because they are refusing to comply with the grooming policy, and because of their refusal, they posed a greater security risk, in the eyes of VDOC policy-makers.  *Blyden v. Clarke*, No. 7:15cv00042, 2015 WL 5043259, at *5–6 (W.D. Va. Aug. 26, 2015) (rejecting equal protection claim because, among other reasons, a plaintiff who is a grooming policy violator is not similarly situated to inmates compliant with the grooming policy).  Thus, Graham's equal protection claim fails because he has not identified similarly situated offenders treated more favorably.

### F.   Property Claim (Claim (k))

Defendants are entitled to summary judgment as to Graham's claim that his property was taken or damaged.  Allegations that prison officials deprived an inmate of his property, whether intentionally or as a result of negligence, do not state any constitutional claim "if a meaningful post-deprivation remedy for the loss is available."  *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). Graham possessed tort remedies under Virginia state law, see Virginia Code § 8.01–195.3, which allows him to recover damages for "negligent or wrongful" acts of state employees acting within the scope of their employment.  Thus, it is clear that he cannot prevail in a constitutional claim for the alleged property loss in this case,[23] and defendants are entitled to summary judgment as to claim (k).[24]

### G.   Graham's Claims Relating to His Disciplinary Convictions (Claims (c) and (n))

Graham also raises claims related to two different disciplinary proceedings.  First, on March 31, 2016, defendant Caudill charged Graham with disciplinary offense #201A for disobeying a direct order (WRSP-2016-0413).  (Franks Aff. ¶ 5, Encl B, Dkt. No. 92-7.) According to Caudill, Graham refused to give up his meal tray after being asked several times. Graham claims that what actually occurred was that Caudill threw Graham's tray on the ground of his cell and told Graham to pick it up, but Graham refused to do so because he had already

---

[23]  Graham does not appear to be claiming that his property was destroyed pursuant to a prison policy, so the court need not address the slightly different analysis for a deprivation pursuant to policy, which can sometimes require pre-deprivation procedures.  *Parratt v. Taylor*, 451 U.S. 527, 537 (1981); *Zinermon v. Burch*, 494 U.S. 113, 128 (1990) (explaining that a violation occurs only if the procedural protections in the policy are inadequate to ensure that deprivations are lawful).

[24]  The court does not construe Graham as claiming that, through the confiscation or destruction of his "legal papers," defendants hindered his access to courts.  If he intended to assert such a claim, though, it fails because he has not identified any particular court proceeding that was negatively impacted by defendants' actions, as required to state such a claim.  *See Lewis v. Casey*, 518 U.S. 343, 350–53 (1996) (explaining that to state an actionable § 1983 claim for denial of his right of access to the courts, an inmate must allege facts showing that the challenged prison policy or official action has actually "hindered his efforts to pursue" a nonfrivolous legal claim); *Christopher v. Harbury*, 536 U.S. 403, 415–16 (2002).

handed his tray to Caudill once.[25]  Graham was convicted of the offense after a hearing that he

attended, and he was penalized with a $10.00 fine.  (Franks Aff. ¶ 8.)  Graham appealed and the

finding of guilty was upheld on April 28, 2016.  (*Id.* & Encl. C.)

Second, on February 26, 2016, Correctional Officer B. Roberts charged Graham with

possession of intoxicants, disciplinary offense #241A (WRSP-2016-0232).  (Hensley Aff. ¶ 5,

Encl B, Dkt. No. 92-8.)  The disciplinary offense report indicates that Officer Roberts was

conducting a walkthrough of Graham's cell when he saw a peanut butter jar with a yellow liquid

inside.  (*Id.*)  Roberts opened the jar and smelled a very strong alcoholic smell, and he later wrote

that Graham was the only offender in the cell.  (*Id.,* Encl. B.)  Graham insists that the liquid was

apple juice with syrup, and he complains that the substance was never tested to determine

whether it in fact contained alcohol.  Nonetheless, Graham was convicted of the offense after a

hearing that he attended, and he was fined $10.  Although Graham claims that he was penalized

twice for this offense (WRSP -2016-0232), because he was also held in segregation before and

after the hearing, the $10.00 fine was the ***only*** penalty imposed as a result of that conviction.

(Anderson Aff. ¶ 4, Encl. A; *see also* Anderson Aff. ¶ 4, Encl. B (explaining Graham's custody

and classification status during that time period).[26]

Graham asserts that both of these disciplinary proceedings violated his due process rights.

---

[25] Graham separately contends that Caudill's throwing of an empty tray on plaintiff's cell floor constituted an Eighth Amendment violation.  But Caudill's action did not involve a "nontrivial" use of force, as required to state an excessive force claim, *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010), nor did it result in a "serious or significant physical or emotional injury" or pose a "substantial risk of such serious harm."  *Shakka*, 71 F.3d at 166  (describing evidence needed to prove such an Eighth Amendment conditions-of-confinement claim). To the extent that Graham contends the behavior was degrading, "[m]ere threats or verbal abuse by prison officials, without more," do not constitute Eighth Amendment violations.  *Henslee v. Lewis*, 153 F. App'x 179, 179 (4th Cir. 2005).

[26] This fact also dooms Graham's argument that his disciplinary conviction violated the constitutional prohibition against double jeopardy.  Moreover, double jeopardy protections do not apply in the context of disciplinary proceedings.  *Edwards v. Braxton*, No. 7:14-CV-00550, 2005 WL 1388746, at *4 (W.D. Va. June 10, 2005) ("[T]he double jeopardy claim does not apply to [prison] disciplinary hearings." (*citing Breed v. Jones*, 421 U.S. 519, 528 (1975))); see *also Coles v. Washington*, No. 3:11CV194, 2012 WL 443543, at *4 (E.D. Va. Feb. 10, 2012) (collecting authority).

Among other alleged violations, he alleges that the hearing officers were biased against him, that the substance in the second offense was never tested to determine whether it was alcohol, and that no video was ever reviewed by the hearing officer in the first offense to determine whether Graham was telling the truth about Caudill throwing Graham's tray on the floor.

The court concludes, however, that neither of these disciplinary proceedings triggered constitutional due process protections.  "To state a procedural due process violation, a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015).  At least in the context of liberty interests, the Supreme Court has squarely held that an inmate establishes a constitutionally protected liberty interest by showing an "atypical and significant" hardship or deprivation in relation to the ordinary incidents of prison life. *See Sandin v. Conner*, 515 U.S. 472, 484 (1995) (holding that disciplinary segregation did not present the type of atypical, significant deprivation that would give rise to a protected liberty interest).

The $10 monetary fines imposed here were insufficient to trigger constitutional due process protections.  As several judges of this court have recognized: "[S]mall monetary penalties and penalties that do not impose restraint do not impose atypical and significant hardship on a prisoner in relation to the ordinary incidents of prison life and are not constitutionally protected interests under the Due Process Clause." *Roscoe v. Mullins*, No. 7:18CV00132, 2019 WL 4280057, at *3 (W.D. Va. Sept. 10, 2019) (granting summary judgment in defendants' favor as to the due process claim where the only penalty imposed was a $15 penalty), *appeal docketed*, No. 19-7343 (4th Cir. Sept. 24, 2019); *Ferguson v. Messer*, No. 7:15CV00140, 2017 WL 1200915, at *8 (W.D. Va. Mar. 30, 2017) (concluding that three $12 fines did not give rise to a protected property interest); *Bratcher v. Mathena*, No. 7:15CV00500, 2016 WL 4250500, at *1 (W.D. Va. Aug. 10, 2016) (finding $12 fine did not pose an atypical

and significant hardship on the plaintiff in comparison to the ordinary incidents of prison life and so did not constitute a loss of a property interest).  Like the plaintiffs in those cases, Graham was subjected only to a small fine of $10 for each offense—a penalty that is insufficient to give rise to a protected property interest in the context of prison life under the rationale of *Sandin*.[27]

For these reasons, the court concludes that the fine imposed on Graham for these two disciplinary convictions did not place any atypical and significant hardship on him in comparison to the ordinary incidents of prison life, *Sandin*, 515 U.S. at 484.  Thus, it did not trigger due process protections and the court need not address whether the proceedings here comported with due process.

## H.  Graham's Claim Related to His ICA Hearing and Annual Review (Claim (l))

In claim (l), Graham asserts that he was improperly placed at a higher security level than he should have been and asserts that this violated his due process rights.  In April 2016, Gilbert conducted Graham's annual review.  The annual review includes a review of the offender's good time earning level.  After considering a number of factors (Graham claims many of them incorrectly or unfairly) and exercising his discretion in the matter, Gilbert concluded that Graham should be a Class Level III for purposes of earning good time credits; Graham contends that he should have been a Level Earning II.  The ICA approved the Level III determination.  In

---

[27] Although the Fourth Circuit has not yet spoken directly on this issue, some courts have questioned whether *Sandin*'s analysis—requiring that the particular hardship be "atypical and significant" to create a constitutionally protected interest—applies in the context of property deprivations, given that *Sandin* addressed whether a particular deprivation implicated a liberty interest.  *See Anderson v. Dillman*, 824 S.E.2d 481, 483–84 (Va. 2019) (noting the disagreement among federal courts on this issue and discussing the different rationales underlying the decisions).  In particular, the *Anderson* court noted that cases from the Sixth and Tenth Circuits have applied *Sandin* in the context of property rights, while the Third and Fifth Circuits have stated *Sandin* does not control in a case involving a property interest.  *Anderson*, 824 S.E.2d at 483 & n.4 (collecting authority); *see also Steffey v. Orman*, 461 F.3d 1218, 1222 n.3 (10th Cir. 2006) (identifying the Second and Fifth Circuits as holding that *Sandin* applies only to liberty interests and the Sixth and Ninth Circuits as suggesting, but not holding, the same).  The Fourth Circuit indicated, albeit in an unpublished decision, that *Sandin* is applicable in this context when it applied *Sandin* to conclude that a prisoner "did not have a constitutionally protected liberty or property interest in his prison job."  *Backus v. Ward*, 151 F.3d 1028, 1998 WL 372377, at *1 (4th Cir. 1998) (unpublished).

2017, Graham was placed in a Class II category by Gilbert.  (Gilbert Aff. ¶ 5, 12, 13 Dkt. No. 92-5 & Encls.)

Graham appears to be claiming that he should have had a higher class level and earned good time credits at a higher rate, but because of Gilbert's decisions, he did not, resulting in him serving "additional" time on his period of incarceration that ended in October 2017.  He points out what he believes were a number of errors Gilbert committed in the process and also argued that Gilbert did not have the discretion or authority to deviate from the formula to increase Graham's security level.  Graham thus appears to challenge both the process and the substance of his review.

Defendants first argue that Graham's claim attacking his ICA hearing and its results is not cognizable under § 1983 because it affects the length of his confinement and thus should have been raised in a habeas petition.  Graham counters that he already has served that additional time and has been released and thus, relief on the claim would not imply the invalidity of his *current* confinement.

Regardless of whether his claim is properly addressed in the context of a § 2254 petition or a § 1983 case, though, his claim fails.[28]  A number of courts have held that Virginia prisoners have no liberty interest in any particular classification or good conduct time earning rate, either derived from the United States Constitution, *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974), or as the result of Virginia laws or policies, *Garner v. Clarke*, No. 7:18CV00560, 2019 WL 4455984, at *2–3 (W.D. Va. Sept. 17, 2019), *appeal docketed*, No. 19-7601 (4th Cir. Oct. 23, 2019). *See Mills v. Holmes*, 95 F. Supp. 3d 924, 931–34 (E.D. Va. 2015) (analyzing Virginia statutes and VDOC regulations and concluding that "maintaining a particular ... earning level" for good

---

[28]   The court thus declines to construe his claim as a § 2254 petition.

conduct "is not a protected liberty interest in Virginia").  The Fourth Circuit has also so held,

although in an unpublished decision.  *West v. Angelone*, 165 F.3d 22, 1998 WL 746138, at \*1

(4th Cir. 1998) (unpublished table decision) ("Inmates have no protected liberty interest in

remaining in or being assigned to a particular good conduct allowance level . . . .").  Thus, no

due process claim can be asserted based on Gilbert's determination of Graham's class earning

level.

## I.    Other Defendants and Official-Capacity Damages

Other than the defendants who have been named as to the claims surviving summary

judgment, none of the other defendants had personal involvement in the remaining claims, and,

for the reasons set forth in defendants' summary judgment briefing, they cannot be held

personally liable either for responding to a grievance or on a theory of supervisory liability.

(Defs.' Mem. Supp. Renewed Mot. Summ. J. 26–30, Dkt. No. 92.)  Likewise, VDOC and

Wallens Ridge are not proper defendants, for the reasons set forth in defendants' summary

judgment motion.  (*Id.* at 26.)  Thus, all claims against all other defendants except those listed

above will be dismissed.

Similarly, for the reasons set forth by defendants, all claims for money damages against

the remaining defendants in their official capacities are dismissed.  (*Id.* (citing *Will v. Michigan

Dep't of State Police*, 491 U.S. 58 (1989)).

## J.    Graham's Other Motions

While the summary judgment motion was pending, Graham filed a document that has

been docketed both as a motion for a preliminary injunction and a motion for appointment of a

master.  The motion for preliminary injunction is arguably related to his remaining claims, in that

he continues to complain about insufficient food, weight loss, and the denial of his requested

religious diet.  It is also broader, though, in that it now encompasses a facility other than Wallens

Ridge (Greenville) and suggests that he has an allergy to eggs, which was not alleged in his amended complaint in this case or in any of his summary judgment briefing.

The remaining defendants will be required to respond to the motion for injunctive relief not later than thirty days after entry of this order. As to the request for appointment of a master, that motion will be denied. In the event that the court concludes that a hearing is required on his pending motion, it will either conduct the hearing itself or refer it to the assigned magistrate judge. No "master" is required to conduct the hearing and, in the event that injunctive relief is ordered, no "master" is required to implement it, as Graham seems to suggest.

### III. CONCLUSION

For the reasons stated herein, defendants' motion for summary judgment will be granted in part and denied without prejudice in part. Graham's motion for appointment of master will be denied, and defendants will be required to respond to Graham's motion for preliminary injunctive relief. An appropriate order will be entered.

Entered: September 28, 2020.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge